

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

June 17, 2021

**BY ECF AND EMAIL**

The Honorable George B. Daniels
United States District Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, New York 10007

  Re: *United States v. Joel Davis*, S1 18 Cr. 685 (GBD)

Dear Judge Daniels:

  The Government respectfully submits this letter in advance of the June 22, 2021 sentencing of defendant Joel Davis (the "defendant" or "Davis") and in response to the defendant's sentencing submission dated June 14, 2021 ("Def. Mem."). The applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range for the defendant is 262 to 327 months' imprisonment, with a mandatory minimum term of 120 months' imprisonment. (Presentence Investigation Report, dated April 9, 2020, ("PSR") ¶¶ 8, 116, p. 28.)

  The defendant collected thousands of images and hundreds of videos of violent child pornography depicting acts of extreme brutality against toddlers and infants. He exchanged these materials with dozens of others engaging in the same conduct by using an encrypted online chat application, while explaining that his sexual urges had "no limits," that he sought images of children aged "0+," that he sought to molest children himself, and that he had, in fact, done so. The defendant successfully arranged a meeting with an underaged male victim and had sex with that victim, knowing that he was underage. Prior to that encounter, the defendant told an online chat partner (who was in fact an undercover law enforcement official) that he was about to have sex with a 13-year-old boy and invited the official to join him, providing his home address. After the encounter, the defendant bragged to online chat partners about having sex with a 13-year-old and sent images he made while he was having sex with the minor victim. A sentence within 262 to 327 months' imprisonment—the sentence called for by the Guidelines—should be imposed in this case.

Hon. George B. Daniels
June 17, 2021
Page 2 of 14

I.      **Background and Offense Conduct**

The charges in this case stem from an investigation by agents with the Federal Bureau of Investigation ("FBI") into the online exploitation of minors and distribution of child pornography. In this investigation, undercover law enforcement officers ("UC-1" and "UC-2") posted a message on or about May 15, 2018 on a website known to the FBI to be a locus of distribution of child pornography and used extensively by individuals with a sexual interest in children. (PSR ¶ 13.) The message read "Looking for other no limits TABOO pervs in DC area. Bi dad here." (*Id.*) The defendant replied to the message, intuiting the poster's interest in children, writing, "Need me to come down and watch ur kids for a night :)." (*Id.*) The FBI replied, and for the next several months the defendant and the UCs exchanged messages in which the defendant sent child pornography images and videos to the UCs while repeatedly expressing his desire to engage in sex with children, including children the defendant believed to be in the care of the UCs. (*Id.* ¶ 14) For example, in conversations with UC-2, the defendant, who believed UC-2 had occasional charge of a nine-year-old girl and a two-year-old girl, discussed particular plans to meet with UC-2 so that the defendant could have sex with them. (*Id.*)

In late May 2018, the defendant exchanged text messages with UC-1 during which the defendant explained that he was interested in children aged "0+" and that with respect to sexual conduct involving children he had "no limits." (*Id.* ¶ 15.) The defendant advised UC-1 that he had engaged in sexual activity with a nine-month-old boy, a six-year-old girl, and a seven-year-old boy. (*Id.*) After UC-1 told the defendant that he had an eight-year-old daughter, the defendant replied, "If you're legit I'd love to come down and eat her pussy." (*Id.*) As the conversations between the defendant and UC-1 progressed, the defendant told UC-1 that he had child pornography depicting infants. (*Id.* ¶ 16.) Among other materials, the defendant provided UC-1 images that appeared to be:

- A female toddler orally penetrated by an adult penis;
- A female toddler between the legs an adult male who has positioned his erect penis near the toddler's face;
- A prepubescent child spreading his or her anus;
- A male toddler anally penetrated by an adult penis;
- A nude infant;
- A crying infant with an adult male who has positioned his erect penis near the infant's face;
- A nude infant with an adult male penis in close proximity to the infant; and
- A female toddler lying nude on her back with an adult male who has positioned his penis near the toddler's vagina.

(*Id.*) By late May 2018, UC-2 and the defendant were also chatting. (*Id.* ¶ 17.) The defendant told UC-2 that he lived on the Upper East Side of Manhattan, had "no limits" when it came to sexual activity with minors, and was interested in "both girls and boys" aged "0+." (*Id.*) In initial

Hon. George B. Daniels
June 17, 2021
Page 3 of 14

conversations with UC-2, the defendant claimed that he had previously digitally penetrated a three-year-old girl's vagina and said that he "love[s] a baby cunt." (*Id*.) The defendant further claimed that he had previously attempted to engage in anal sex with a seven-year-old boy, but that he "couldn't get it in and he was struggling to[o] much." (*Id*.)

Eventually, UC-2 represented to the defendant that he had care of a nine-year-old daughter and occasional access to a two-year-old daughter, purportedly via UC-2's girlfriend. (*Id*. ¶ 19.) With respect to UC-2's nine-year-old daughter, the defendant wrote, "God id love to eat her pussy," "we can watch baby vids too / while you fuck her mmm," and "I just want her cunt / I want to eat her cunt so bad." (*Id*.) The defendant repeatedly asked UC-2 to produce naked pictures and videos of UC-2's nine-year-old daughter and send them to the defendant, and asked, "When am I going to meet her?" (*Id*.) Turning his attentions to the two-year-old, the defendant asked UC-2 "When do u have that baby alone next" and suggested that UC-2 show the defendant the two-year-old to the defendant via video chat. (*Id*.) After explicitly discussing sexual encounters that UC-2 had with the two-year-old, the defendant asked UC-2 if he had any pornographic images of either the nine-year-old or the two-year-old. (*Id*.) The defendant then offered to trade images from his "collection" of "mostly baby/toddler" pornography in exchange for images of UC-2's daughter and the two-year-old in his care. (*Id*.) Soon after, among other materials, the defendant provided UC-2 images that appeared to be:

- A female toddler engaged by an adult male in oral sex;
- A female child under the age of five with her hands on an erect penis that is in close proximity to her mouth;
- A female toddler between the legs an adult male who has positioned his erect penis near the toddler's face;
- A prepubescent child lying on top of another child, while another individual spreads the prepubescent child's buttocks, exposing the child's anus;
- A male toddler anally penetrated by an adult male penis;
- A female toddler who is nude lying on her back with an adult male who has positioned his erect penis near the child's vagina; and
- An infant crying as an erect penis is positioned near the infant's face.

(*Id*. ¶ 21.) On or about June 13, 2018, the defendant told UC-2 that he expected a 13-year-old boy was coming to the defendant's apartment to have sex with the defendant, and, believing UC-2 to be local to the New York City area, invited UC-2 to join. As UC-2 attempted to determine if the defendant was preparing to in fact engage in sexual activity with a minor, the defendant provided UC-2 his true address. Although additional statements by the defendant caused law enforcement to doubt that a minor child was in fact arriving at the defendant's apartment, the defendant later sent images to UC-2 depicting the minor child ("Victim-1") and the defendant engaged in sexual activity. (*Id*. ¶ 23.)

The defendant engaged in extensive conversations with others using the encrypted chat

application on his cellphone, during which conversations child pornography was exchanged and the defendant repeatedly and graphically outlined his confirmed his interest in violent sex with minors. The search of the defendant's phone revealed approximately 4,700 chat messages in the encrypted chat application alone. These exchanges included, among others, the following conversations with distinct users:

- In conversations beginning on or about March 16, 2018, the defendant told another user "I'm stroking rn [right now] watching baby rape vids wbu [what about you]." The user asked if the defendant had "ever rape[d] a kid" to which the defendant replied, "Hell yeah / little 6yo / was a camp my friend worked at / I visited on the last day / cornered him after pool activity in the locker room / made him feel good at first was pretty nice / but I snapped lol / loved hearing him cry fuck / he pissed himself he was so scared." Later, after the user claimed to have molested his younger sister, the defendant wrote, "I love little toddler pussy / boy ass tastes better tbh [to be honest] / but girls are more fun to make cry / for me anyways." After the user claimed to also live in New York City, the defendant asked "Mmm fuck man / I need a boy so bad / or any kid tbh / u know any we could drug?" The defendant continued speaking with this user about assaulting children and exchanged child pornography until hours before his arrest in June 2018.

- In conversations beginning on or about March 27, 2018, the defendant and another user discussed trading child pornography, during which conversation the defendant asked if the user had access to children or his own kids, and wrote, "I prefer babies-toddlers." Later, the defendant told the user, "Mmmm thinking about raping a baby? I fondled a kid the other day at Macy's / 7yo."

- In conversations beginning on or about March 29, 2018, the defendant told a user that his first experience was when he molested an infant cousin who was a family member. The defendant then claimed that he had "finger raped a girl on a train once / On the NJ transit this little girl kept running up and down the aisle. Her dad fell asleep and I whispered for her to come over and we went to the last car and I shoved my hand under her skirt and into her pull-up and started playing with her pussy hard / she tried to stop me and push me away / started crying […] I left her in the car and got off at the next stop." The defendant then asked the user if he could provide any "vids with ur kid?" When the user replied that he wished he had videos of his own child but "too scared to you know?" the defendant replied "don't be scared haha […] it's hot to have something to look back at ;)." The defendant then asked the user to describe how he abused his child, and the user provided extensive details. Later, after the user asked for child pornography website links, the defendant replied, indicating wariness of law enforcement "Links are dangerous / I have downloaded vids / but I only trade haha."

- In conversations beginning on or about May 22, 2018, the defendant told a user "No limits on age / Younger the better / I'm a total pedo / I'd rape an infant bro / I'd rape a little baby

bro." The defendant then claimed he "molested a couple kids" including a seven-year-old in a bathroom and a four-year-old girl at a water park. Later, the defendant asked the same user, "Would u snuff [murder] a baby while u fuck it" to which the user replied "Hell yeah I would." In response, the defendant wrote, "Fuck I want to rape and kill a baby in front of his father." The defendant the user then exchanged child pornography, eventually writing in response to particular images, "I need to kidnap / Let's kidnap one and rape it / no mercy / little sex toys / to use and abuse." The defendant suggested a scenario in which he and the user would both engage in sexual contact with an infant, then asked the user, "Would u keep raping him even if he stopped breathing." After the user applied in the affirmative, the defendant wrote, "Mmmm FUCK YES / I want to kill kids with u / I want to rape them to death / I want my cock covered in baby blood tbh [to be honest] / I've cum like 5 times today from kiddie porn." In later conversation with the same user, the defendant told the user, "I'm really into torturing girls / cuz I care less about them / would [fuck any baby] but would rather hurt girls and black babies."

- In conversations beginning on or about May 25, 2018, the defendant exchanged messages with one user who suggested an interest in young teens, writing, "[I have] no limit / way younger than teen lol / like toddler." After he was asked what he would do with a "willing" toddler, the defendant replied, "O u like willing lol / I mean depends how little but fuck him / feed him my cock / molest him / Mmm."

- In conversations beginning on or about May 28, 2018, the defendant told a user, "Fuck dude I'm such a pedophile I love it." The user replied that he was considering sexually assaulting his nephew, but that he needed to wait "till I know he won't say anything. Might just give him sleeping pills tho" and the defendant replied, "Yeah dude drug him seriously." Later, the defendant explained that his experiences included "Raped a 7yo in a Macy's / Kid was alone in the bathroom at the urinal I went behind him and reach around fondled his cock told him I'd kill him if he screamed licked his neck and ear / took out my cock and then half carried him into a stall he was pissing / and I tried to fit my cock in and it barely fit." The user then explained New York City was too far away, writing "Damn wish u where closer we could hang out and fuck a few kids, to which the defendant replied, "Me too / I want to rape kids all day / I wanna rape and torture a baby girl."

- In conversations beginning on or about June 7, 2018, the defendant told a user that he "love[d] baby rape" and had "molested a few kids" including one who was "9mo" old.

- In conversations beginning on or about June 7, 2018, while trading child pornography with another user, the defendant was advised by the other user that a man in a particular series had one video which "includes some blood" to which the defendant replied "oh fuck / who / I want blood / I've seen a lot of his vids / but there wasn't blood." The defendant then offered to provide additional materials to the user that the defendant possessed, including the man in the particular series.

- In conversations beginning on or about June 7, 2018, the defendant told another user that he was interested in children "up to 13" and that his experiences included a time that he "molested a boy at Macy's about 7. Following him into a bathroom stall went up behind him and covered his mouth. Fondled him and licked his neck and told him I'd kill him if he screamed. He pissed in my hand then I shoved him into the wall and ran out." The defendant later wrote, "I love being a pedophile / I want to find another kid to molest soon / I need it / Kiddie porn isn't enough / I want to make a baby choke / I'd even eat little baby cunt."

- In conversations beginning on or about June 7, 2018, the defendant invited a user to his apartment in New York, writing, "Can u come into the city and watch baby porn and fuck?" The defendant later told the same user, "I need pedo cock rn [right now] / and to rape a boy" and explained that a "pedo" was going to come over and watch child pornography with the defendant, but that he was not "into snuff [murder] like me and you but otherwise [twisted like and me and you]." On or about June 13, 2018—the same day the defendant had sex with Victim-1 and told UC-2 he was meeting up with Victim-1—the defendant wrote to the user, "I fucked a 13yo today / met him on Grindr." After a request from the user for an image of the encounter, the defendant sent a video to the user, who replied "omg / love how he calls you daddy."

- In a conversation with UC-2 on or about June 14, 2018, the defendant confirmed his sexual encounter with Victim-1: "Fucked a 13yo yesterday."

- In conversations beginning on or about June 8, 2018, the defendant told a user who described a predilection for infants "in Africa," that he was "not into black babies / would snuff [murder] one too fast bcuz I don't care […] I'd love to strangle a little black boy / with my cock deep inside."

The defendant also engaged in similar conversations with others on other messaging platforms, including text message, iMessage, and WhatsApp. These exchanges, which similarly involved the exchange of child pornography and discussion of violent sexual acts with infants and children, included, among others, the following conversations with distinct users:

- In an iMessage conversation dated on or about June 22, 2018 between the defendant and an individual saved in his cellphone contacts as "Michigan," the defendant wrote, among other things: "I need a newborn / I wanna rape it in front of the mom." During the conversation, "Michigan" sent the defendant a photograph of his young nephew and asked what the defendant would do to the child, to which the defendant responded, in substance and in part: "Love to feed him my cock / Eat his little ass / Lick his hole and suck his little penis / Mmmm cum all over him 😍😍 cover him / Finger him."

- In an iMessage conversation starting on or about June 23, 2018, the defendant and an individual saved in his cellphone contacts as "Daniel 😍" discussed acts of violence toward infants and toddlers, and black infants and toddlers in particular. During those conversations, the defendant wrote, among other things: "You wanna kill niggers ???? 😈😈😈 rip appart a little black baby" and "I wish I was whiter / I want to bleach my skin so bad."

The defendant was arrested on June 26, 2018. (*Id*. ¶ 23.) Following his arrest, and after he was advised of and waived his rights under *Miranda*, the defendant admitted that he engaged in the above-mentioned conversations with the UCs, that he was in Manhattan when he engaged in the offense conduct, that he traded and kept child pornography on his phone, that he was particularly interested in infants and toddlers, that he solicited the UCs to produce images and videos of the minor children he understood to be in their care, and that he attempted to arrange meetings to meet with the UCs and those children. (*Id*.) The defendant further admitted that although he wanted to think he would not have followed through on his meetings with those children, he was also wary that the UCs could, in fact, have been law enforcement, and may have followed through with the meetings had he been assured that the UCs were not affiliated with law enforcement. (*Id*.) Notably, the defendant admitted that the child he told UC-2 he was meeting as described above was in fact Victim-1, a 15-year-old boy, that he met with Victim-1 in his Manhattan apartment, and that he and Victim-1 had engaged in oral and digitally penetrative sex. (*Id*.) The defendant then confirmed that the photographs he sent UC-2 were photographs of the sexual encounter with Victim-1. (*Id*.) The FBI interviewed Victim-1, who confirmed he was 15 years old at the time of the sexual encounter with the defendant and confirmed he and the defendant had sex. (*Id*. ¶ 25.) Victim-1 identified himself in the photographs the defendant had sent UC-2 of the encounter, but Victim-1 stated that he did not remember any photographs or videos being taken. (*Id*.)

A search of the defendant's cellphone revealed that, at the time of his arrest, the defendant was in possession of 3,719 images and 331 videos depicting child pornography. From those images and videos, 448 images and 87 videos consisted of previously identified or known victims. (*Id*. ¶ 24.)

The defendant has been detained since his arrest. On or about January 16, 2020, the defendant pled guilty to a superseding information charging the defendant with enticement of a minor—Victim-1—to engage in illegal sexual activity in violation of Title 18, United States Code, Sections 2422(b) and 2; possession of child pornography in violation of Title 18, United States Code, Sections 2252A(a)(5)(B), (b)(2), and 2; and distribution and receipt of child pornography in violation of Title 18, United States Code, Sections 2252A(a)(2)(B), (b)(1), and 2. (*Id*. ¶¶ 1-4.)

## II. The Defendant's Plea and Applicable Guidelines Range

On January 16, 2020, the defendant entered a guilty plea to all three counts of the Superseding Information pursuant to a plea agreement (the "Plea Agreement") with the Government. (PSR ¶ 4.) The parties agreed that Count One formed one group ("Group 1") and Counts Two and Three formed another group ("Group 2").

The Plea Agreement stipulated that, for Group 1, the base offense, pursuant to the United States Sentencing Guideline ("U.S.S.G.") 2G1.3 is 32; but that pursuant to U.S.S.G. § 2G1.3(c)(1) and application note 5(A), because the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purposes of producing a visual depiction of such conduct and application of 2G2.1 would yield a higher offense level, the cross reference to U.S.S.G. § 2G1.2 applies. Thus, pursuant to U.S.S.G. § 2G2.1(a), the base offense level is 32; pursuant to U.S.S.G. § 2G2.1(b)(1)(B), two levels are added because the offense involved a minor who was at least twelve years old but not yet sixteen years old; pursuant to U.S.S.G. § 2G2.1(b)(2)(A), two levels are added because the offense involved the commission of a sexual act; pursuant to U.S.S.G. § 2G2.1(b)(3), two levels are added because the defendant knowingly engaged in distribution; and pursuant to U.S.S.G. § 2G2.1(b)(6)(B)(i), two levels are added because the offense involved the use of a computer or an interactive computer service. Therefore, the offense level for Group 1 is 40.

The Plea Agreement further stipulated that, for Group 2, the base offense, pursuant to U.S.S.G. § 2G2.2(a)(2), is 22; pursuant to U.S.S.G. § 2G2.2(b)(2), two levels are added because the material involved a prepubescent minor or minor who was not yet twelve-years-old; pursuant to U.S.S.G. § 2G2.2(b)(3)(F), two levels are added because the defendant knowingly engaged in distribution; pursuant to U.S.S.G. § 2G2.2(b)(4)(B), four levels are added because the offense involved material that portrays sexual abuse or exploitation of an infant or toddler; pursuant to U.S.S.G. § 2G2.2(b)(6), two levels are added because the offense involved the use of a computer or an interactive computer service; and pursuant to 2G2.2(b)(7)(D), five levels are added because the offense involved 600 or more images. Therefore, the offense level for Group 2 is 37.

The Plea Agreement further stipulated that, pursuant to the grouping rules under U.S.S.G. § 3D1.4(a), two levels were added to the highest offense level of 40, bringing the adjusted base offense level to 42. Then, three levels were subtracted for acceptance of responsibility. Thus, the Plea Agreement found an offense level of 39. Based on the defendant's Criminal History Category

of I, the Plea Agreement concluded that the defendant's Stipulated Guidelines range was 262 to 327 months' imprisonment, with a mandatory minimum term of 120 months' imprisonment.

The Probation Office also concluded in its PSR that the defendant's applicable Guidelines range was 262 to 327 months' imprisonment (the "Guidelines Range"), based on the same calculation set forth in the Plea Agreement. (PSR ¶ 116, p. 28). The Probation Office has recommended a sentence of 156 months' imprisonment on Count 1, with 60 months' imprisonment on Counts 2 and 3 to run concurrently with the sentence imposed on Count 1, to be followed by a five-year term of supervised release to run concurrently on all three counts. (*Id*. at p. 28).

### III. Applicable Law

Although the Guidelines are no longer mandatory, they provide strong and relevant guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"—that range "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). As the Second Circuit has remarked *en banc*, although the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (internal quotation marks omitted). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349.

After making the initial Guidelines calculation, a sentencing judge must then consider the seven factors outlined in Title 18, United States Code, Section 3553(a), including, among others, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentencing disparities.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, including:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and

>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent the District Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Cavera*, 550 F.3d at 189 (quoting *Gall*, 552 U.S. at 50).

## IV. Discussion

In light of the nature and circumstances of the instant offense, as well as the history and characteristics of the defendant, the Government respectfully submits that a sentence within the Guidelines range of 262 to 327 months' imprisonment would be sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. Such a sentence is also necessary to achieve an adequate measure of deterrence that signals to other pedophiles the enhanced penal consequences that follow when their trafficking in child pornography is accompanied by a so-called hands-on offense. Finally, for this same reason, such a sentence is further necessary to protect the public by separating the defendant from the children of the community.

The defendant engaged in sexual activity with Victim-1, knowing that Victim-1 was a minor. The defendant bragged about his sexual contact with Victim-1, not only in conversations with UC-2, but also in conversations with at least one other user with whom he was exchanging child pornography. *See supra* p. 6. In both instances, the defendant indicated that Victim-1 was 13 years old. Similarly, during the defendant's recorded post-arrest interview approximately two weeks after this sexual encounter, the defendant told law enforcement, in substance and in part, that he had had sexual relations with a 13-year-old within the past few weeks. In all these contemporaneous statements, the defendant admitted that he thought Victim-1 was 13 years old. The defendant now appears to put forth the following as mitigating factors for his admitted sexual activity with a minor: Victim-1 "had a mustache;" the defendant "believed that he was role playing;" if Victim-1 had been two years older at the time, the sexual activity "would not have been illegal under New York law," and if Victim-1 had been one year younger at the time, "it would only be a misdemeanor offense given how close in age [the defendant] was to" Victim-1. (Def. Mem. at 13, 24.) Moreover, the defendant does not even acknowledge in his submission that he *created* child pornography during that sexual encounter, without the knowledge or consent of Victim-1, and disseminated that child pornography to others. The defendant's rationalizations obscure the reality: the defendant believed he was having sex with a minor, the defendant was having sex with a minor, the defendant told others he was having sex with a minor, and the defendant distributed images of that sex to others who sought child pornography because he thought it was child pornography. The defendant's claims now to the contrary are simply unsupported by any of the contemporaneous evidence.

In addition, it is the Government's view that the defendant's acknowledged self-absorption and egotism continue to prevent him from appreciating the serious and devastating impact his conduct had on the victims depicted in the child pornography that the defendant saved to his phone, many of whom were infants and toddlers. (*See* Def. Ex. A.) An FBI agent has described the approximately 3,719 images and 331 videos the defendant had as among the worst child pornography the agent has seen during more than 10 years working on these cases, based largely on the young age of many of the children depicted in the images and videos. Contrary to the defendant's assertions, the defendant was not merely "role playing" or "indiscriminately" chatting. (Def. Mem. at 14.) He was trafficking sexually explicit and often violent child pornography, much of it of infants and toddlers. The defendant's trafficking in that pornography and even his viewing of it, as the victim impact statements powerfully relate, causes continued suffering for the depicted children. It is enough to focus upon the victim impact statement of John Doe V from the 8kids Series, to read how he feels sick when he thinks of pedophiles watching his degradation as a young child and how he contemplates killing himself. *See* Victim Impact Statement 3. The Government also continues to be troubled by the defendant's creation of and involvement with Youth to End Sexual Violence through the time of his arrest, a nonprofit organization with a mission that is so grossly in tension with the offense conduct in this case and contrary to the defendant's willingness to victimize others (even if, as alleged, in the pursuit of alleged self-harm). (*See* PSR at 32.)

The Government of course does not dispute that the defendant's history and characteristics are relevant and important for the Court to consider in fashioning an appropriate sentence. His lack of criminal history and mental health issues obviously bear on what is an appropriate sentence. (*See* PSR at ¶ 92 and p.32.) In this vein, the defendant asserts that the instant offense results from his own victimization at the hands of unidentified individuals who sexually abused him throughout his childhood. (*See* PSR at ¶¶ 79, 80, 82.) Obviously, the Government has the greatest sympathy for any victim of such abuse, and that sympathy certainly and firmly encompasses what the defendant describes occurred to him. With that said, although any such abuse would be relevant to the issue of what sentence is appropriate, how this fact cuts—whether in favor of greater leniency or severity—is in the good judgement of the Court. Although the defendant suggests that his experience should provide mitigation, it is also the case that the defendant's history (and the allegedly and understandably lasting trauma that he experiences) should have alerted him to the suffering of his victims in a way that someone who had not experienced such sexual abuse could perhaps not understand. And his experiences certainly should have prevented him from ever committing such abuse against a child himself.

Indeed, the defendant discusses his experiences advocating on behalf of victims of sexual violence and his own experiences in attempting to grapple with the lasting effects of his own abuse, but neither set of experiences dissuaded or prevented the defendant from engaging in the instant conduct. The defendant instead suggests that his consumption of pornography was another expression of his own victimization, and that rather than deriving sexual gratification from the imagery he sought, he was consciously seeking to harm himself because of the ways in which he identified with the victims. In other words, viewing their pain reminded the defendant of his own,

and gave rise to feelings of worthlessness the defendant embraced. Even accepting the defendant's premises, this rationalization cannot explain the totality of the defendant's conduct.

First, the defendant most doggedly sought infant and toddler child pornography, in forms of torturous abuse dissimilar both in age range and kind from that which he described enduring himself. Although the defendant explains that at one point in time he sought images of himself online because he wondered if they existed, he clearly sought images of *others* during the period of time he engaged in the instant offense conduct. Moreover, he sought the most violent versions of this pornography he could obtain, eagerly discussing pain, blood, and murder as thematic topics while exchanging images of extremely young victims. As recounted above, the defendant openly discussed his desires to see women and minorities in particular raped, mutilated, and then discarded or murdered. Simply put, the viciousness of the defendant's exchanges went well beyond the claim that he was focused on hurting himself; he was quite clearly focused on seeing others unlike him (*e.g.*, women, minorities whose ethnic or racial backgrounds he does not share) destroyed, and went to extensive lengths to collect those materials.

Second, the defendant did not only consume child pornography, he prolifically distributed it in series of one-on-one chats and in group chat rooms. The defendant did not merely retrieve the materials from the internet and view it, he promulgated it, and discussed the images and videos in question with others in extensive and florid detail while explaining to other users how they inspired his own sexual fantasies. Across these conversations, the defendant described the sexual gratification he obtained from the experiences, undermining his self-serving claim that he did not enjoy what he was doing.

Third, in conversation with other users, he not only sought access to extant child pornography, but he also called on other users with access to children to share images of children in their stead and to create additional imagery, both permanent (photographs and videos) and via telecommunication (*i.e.*, Facetime, Zoom, etc.). The defendant thus encouraged others to *create* child pornography, which he of course understood to mean abuse children anew. Again, the defendant's claim that his motivation was self-loathing is difficult to reconcile with his willingness to allow other children to be victimized. It strains credulity, in light of the defendant's own alleged sexual abuse, that he believed he was only fantasizing when he told dozens of men over the course of thousands of messages that he hoped they would molest children and send him the evidence.

Fourth, and as noted in greater detail above, the defendant himself victimized a minor, recorded it without the minor's knowledge, and disseminated the recordings to other users with whom he exchanged child pornography. In light of these and other factors, the defendant's claim—which amounts to a suggestion that his consumption of child pornography can and should be viewed only through the lens of his own trauma—cannot withstand scrutiny. Knowing the true harms associated with child pornography, the defendant sought it, distributed it, created it, and encouraged others to create it as well. His contributions to the ecosystem of child pornography cannot be ignored. Child pornography may have been a tool the defendant used to hurt himself, but that does not eliminate or even mitigate the harm the defendant's conduct caused others. The

Hon. George B. Daniels
June 17, 2021
Page 13 of 14

Victim Impact Statements submitted by the Government illustrate the limitless harm visited on the victims of the images and videos the defendant collected and shared. Perhaps better aware of this harm than anyone, the defendant engaged in the offense conduct anyway. Thus, as the Government noted above, the defendant's choices in this case (notwithstanding his history, experience, and expertise gathered from extensive advocacy regarding sexual violence) suggest the defendant's management in the community—in other words, his dangerousness—is likely to be a more challenging prospect than the defendant's submission suggests.

Dr. Meg Kaplan's psychosexual and risk evaluation of the defendant resulted in a mixed assessment of his risk of re-offending—according to one metric, the risk is "above average;" according to another, the risk is "moderate;" according to a third, the defendant is in a group with a "risk of 15% of re-offense over 5 years;" according to a fourth, his risk is "low." (Def. Ex. B at 16.) This evaluation therefore does not provide a useful sense of how likely the defendant is to re-offend. Dr. Kaplan's report does reflect that the defendant first viewed child pornography in 2015, years before the offense conduct in this case, when he claims he was looking for himself in the images, and that "[a]fter looking at these images in 2015 he did not look at child pornography again." (*Id.* at 5.) That is, not until he re-offended and began engaging in this offense conduct case. Dr. Kaplan opines that the defendant's risk of re-offending "could be very well managed" if he "is monitored and treated for" psychotic depression. (*Id.* at 16.) The Government notes, however, that the defendant was in therapy for approximately five months leading up to his arrest and was addressing his depression, among other issues, during those therapy sessions. (Def. Ex. at 1-3.) Yet he still engaged in this conduct, and there is no indication that he would have stopped but for his arrest.

The defendant's reliance on *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010) and *United States v. Jenkins*, 854 F.3d 181 (2d Cir. 2017) in an attempt to dismiss the Guidelines is entirely misplaced. (Def. Mem. at 19-21.) The Second Circuit recently confirmed that "[t]he concerns articulated in *Dorvee* and *Jenkins* are . . . inapplicable . . . where the defendant was involved in the production of child pornography and had direct contact with child victims." *United States v. Muzio*, 966 F.3d 61, 65 (2d Cir. 2020). As in *Muzio*, the defendant here had sexual contact with an actual 15-year-old child; the defendant knew at the time of that sexual contact that Victim-1 was, in fact, a minor. Worse still, the defendant surreptitiously took photographs of Victim-1 during that sexual contact without Victim-1's consent (*i.e.*, engaged in the production of child pornography), and then distributed that child pornography to others. This is not a case of mere possession, and "[t]he concerns articulated in *Dorvee* and *Jenkins* are therefore inapplicable here." *Muzio*, 966 F.3d at 65.

Finally, the defendant argues that a sentence of 120 months' imprisonment is sufficient because, while incarcerated, he was subjected to several lockdowns and other challenges in light of the COVID-19 pandemic. (Def. Mem. at 23-24.) The Government acknowledges those challenges. Inmates and staff alike in the Bureau of Prisons ("BOP") have faced unique challenges as the nation and the world have struggled with the impact of the virus. As the Court is aware, the BOP has taken significant measures to curtail the spread of COVID-19. The measures particular

Hon. George B. Daniels
June 17, 2021
Page 14 of 14

to the defendant's experience—quarantine at the MCC, for example—were undoubtedly challenging, but equally necessary to the BOP's mandate of mitigating the virus's spread and limiting the defendant's exposure to others. In light of the BOP's success in limiting the spread of COVID-19 at the MCC and the other sentencing factors addressed throughout this letter, the Government submits that a within-Guidelines sentence is appropriate notwithstanding the complications posed by COVID-19.

### V.     Conclusion

For the reasons set out above, the Government respectfully requests that the Court sentence the defendant to a term of imprisonment within the range of 262 to 327 months, which is the applicable range pursuant to the Guidelines. In addition, the Government respectfully requests that the Court impose five years' supervised release, and order restitution to each of the defendant's identified victims in accordance with the proposed order of restitution, which the Government will separately file with an application for restitution.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By:    /s/_____
Juliana Murray / Matthew Hellman
Assistant United States Attorneys
(212) 637-2314 / 2278

cc:    Ian Marcus Amelkin, Esq. (by ECF and email)